*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0316p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

WARRIOR SPORTS, INCORPORATED,
                    *Plaintiff-Appellant,*

ATHLETE'S CONNECTION,
                    *Plaintiff,*

    *v.*

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,
                    *Defendant-Appellee.*

> No. 09-1395

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 08-14812—Marianne O. Battani, District Judge.

Argued: April 28, 2010

Decided and Filed: August 20, 2010[*]

Before: BATCHELDER, Chief Judge; MOORE and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** John J. Bursch, WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellant. Robert J. Wierenga, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Ann Arbor, Michigan, for Appellee. **ON BRIEF:** John J. Bursch, Charles N. Ash, Aaron D. Lindstrom, WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan, William R. Jansen, Michael G. Brady, WARNER NORCROSS & JUDD LLP, Southfield, Michigan, for Appellant. Robert J. Wierenga, Gregory L. Curtner, David R. Grand, Kimberly K. Kefalas, MILLER CANFIELD, PADDOCK AND STONE, P.L.C., Ann Arbor, Michigan, for Appellee.

_____

[*]This decision was originally issued as an "unpublished decision" filed on August 20, 2010. On September 24, 2010, the court designated the opinion as one recommended for full-text publication.

—————————

**OPINION**

—————————

COOK, Circuit Judge.  Warrior Sports filed suit claiming that, by changing the rule that governs the size of lacrosse stick heads approved for use in NCAA-sanctioned play, the NCAA violated the Sherman Act and tortiously interfered with Warrior's business.  After denying Warrior's preliminary injunction request, the district court granted judgment on the pleadings in favor of the NCAA.  Warrior appeals, and we affirm.

I.

Defendant-Appellee the National Collegiate Athletic Association (NCAA) sets the rules that govern intercollegiate athletic competitions involving its member schools, including the play and equipment rules for men's lacrosse matches.  Other league governing bodies, including the National Federation of High School Sports, adopt and follow the rules set by the NCAA, giving those rules particularly strong influence on the market for lacrosse equipment.  Plaintiff-Appellant Warrior Sports, Inc. manufactures and distributes lacrosse sticks.

Prior to 2006, the rule governing the allowable dimensions of lacrosse stick heads (Playing Rule 1-17) remained unchanged for thirty years, setting the width of the head at a minimum of 6.5" at its widest point and 10" from top to bottom.  Traditional heads were triangular in shape, but because the rule did not specify a minimum width for the base (or "channel") of the head, manufacturers began producing heads with a more pinched shape.  According to the NCAA, the pinched design made it more difficult for a player to dislodge the ball from an opponent's stick during play, which prompted players to use increasing amounts of force when attempting to do so, leading to more injuries.  To address this and other issues, in 2006, the NCAA initiated its rule-changing process.  The NCAA Lacrosse Rules Committee met with equipment manufacturers (Warrior among them) to address potential rule changes, including the addition of a

minimum width requirement for the channel, aimed at resolving the dislodgement problem. On September 7, 2006, the Rules Committee announced proposed changes to Rule 1-17 instituting minimum width requirements for the channel of the stick head. The 2006 Rule Change (intended to go into effect on January 1, 2009) would have rendered the vast majority of all men's stick heads, including 14 of the 15 models marketed by Warrior, illegal for NCAA play. Warrior responded by filing a lawsuit in the Eastern District of Michigan challenging the 2006 Rule Change, but dismissed the action after the NCAA agreed to reconsider the proposed change.

The NCAA solicited additional input from all concerned manufacturers, including Warrior, about how to improve the new specifications. To address the dislodgement issue, Warrior suggested incorporating a "flare" design—a design on which it held a patent, though it failed to disclose that fact to the NCAA at the time. In September 2007, the Rules Committee adopted a new rule (the 2007 Rule Change) intended to go into effect January 1, 2010. Much like the 2006 Rule Change, the 2007 Rule Change would have rendered the majority of stick heads on the market illegal, including all 15 of those marketed by Warrior. Significantly, the measurements incorporated into the 2007 Rule Change promoted a flared head design and closely tracked the design patented (but at the time not being marketed) by Warrior. When the NCAA learned of Warrior's patent after adopting the change, it sent Warrior a letter asking whether and under what terms the company would be willing to license its intellectual property rights to other lacrosse equipment manufacturers. Viewing this correspondence as a veiled threat by the NCAA to change the rules again if Warrior refused to negotiate licenses with its competitors, Warrior responded that it perceived the NCAA's letter as inappropriate and would not consider licensing its rights in the abstract because it did so only on a case-by-case basis.

The NCAA adopted a third rule change in February 2008 (the 2008 Rule Change) and scheduled its effective date for January 1, 2010. Like the 2007 Rule Change, the 2008 Rule Change rendered Warrior's entire existing line of stick heads illegal. The specifications adopted in the 2008 Rule Change differed only slightly from those in the

2007 Rule Change—broadening the range of permissible widths. This modification allows stick heads using either straight or flared walls to satisfy the rule, and any head that would have satisfied the 2007 Rule Change necessarily also passes muster under the 2008 Rule Change. Notably, the 2008 Rule Change permits the use of any stick head designed in conformity with Warrior's patent.

Warrior responded to the 2008 Rule Change by filing suit against the NCAA in the Western District of Michigan accusing the NCAA of violating the Sherman Act and tortiously interfering with its business relationships.[1] Warrior moved for a preliminary injunction and asked the district court to consider the motion on an expedited basis. Concerned that Warrior was forum shopping,[2] the NCAA immediately opposed Warrior's request for expedited consideration of its injunction request and moved to transfer venue to the Eastern District. The court sided with the NCAA, refusing to expedite the injunction request and transferring the case to the Eastern District of Michigan. The NCAA promptly filed an answer and moved for judgment on the pleadings under Rule 12(c). By memorandum opinion dated January 30, 2009, the district court denied Warrior's preliminary injunction motion, *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, No. 08-14812, 2009 WL 230562 (E.D. Mich. Jan. 30, 2009), and later, in a separate opinion, granted judgment on the pleadings in the NCAA's favor, *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n (Warrior II)*, No. 08-14812, 2009 WL 646633 (E.D. Mich. Mar. 11, 2009). Warrior appeals.

## II.

We review the district court's grant of a motion for judgment on the pleadings de novo using the same standard as for a motion to dismiss under Rule 12(b)(6). *EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001). "For purposes of a motion

---

[1] Warrior's complaint also asserted a promissory estoppel claim on which the district court granted judgment in the NCAA's favor. Warrior does not appeal that portion of the court's ruling.

[2] Although the district court never reached the merits of the first lawsuit before Warrior voluntarily dismissed it, the NCAA successfully moved, over Warrior's objection, to stay discovery in that action pending resolution of the NCAA's Rule 12(b)(6) motion—suggesting a motive for Warrior's choice of the Western District for its second filing.

for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citation and quotation marks omitted).

## A.

Warrior alleged that the changes to Rule 1-17—including the 2008 Rule Change, which the NCAA "appears to have" adopted "for improper and anticompetitive reasons under the influence of one or more of [Warrior's] competitors"—violated § 1 of the Sherman Act, which prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Because "nearly every contract binding parties to an agreed course of conduct amounts to some sort of 'restraint of trade,' the Supreme Court has limited the restrictions of section 1 to bar only 'unreasonable restraints.'" *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005) (quoting *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003)).

The district court examined all three of the changes to Rule 1-17. It concluded that the 2006 and 2007 Rule Changes were noncommercial and therefore immune from antitrust challenge. Assessing the 2008 Rule Change, the court found that, in light of Warrior's accusation that the NCAA enacted it in collusion with Warrior's competitors, the 2008 Rule Change served a commercial purpose because Warrior's "competitors presumably sought to enact the rule in order to benefit commercially." *Warrior II*, 2009 WL 646633, at *4. The court nevertheless rejected Warrior's antitrust claim, finding that the 2008 Rule Change did not restrain trade or commerce because, when compared to the 2007 Rule Change, the 2008 rule expanded the range of stick head designs that could meet the standards for NCAA-approved play. *Id.*

We agree with the district court's ultimate conclusion, but employ a slightly different analysis. The NCAA dropped the 2006 and 2007 Rule Changes before they ever went into effect, and thus they cannot be challenged because they necessarily did

not cause (nor do they threaten to cause) any injury to Warrior or anyone else.  *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 788–89 (6th Cir. 2002) ("An antitrust plaintiff bears the burden of showing that the alleged violation was a material cause of its injury, a substantial factor in the occurrence of damage or that the violation was the proximate cause of the damage.").  So although the district court chose to compare the 2008 Rule Change to the 2007 Rule Change to determine whether the 2008 rule restrained trade or commerce, we find that comparison inapt, given that the 2007 rule never took effect.  Rather, as the sole rule change ever to take effect, only the 2008 Rule Change matters for purposes of the antitrust analysis.

Although the district court concluded that Warrior's allegation of collusion between the NCAA and Warrior's competitors transformed the otherwise noncommercial rule governing athletic competition into a commercial one subject to antitrust scrutiny, we avoid that question by assuming the rule to be commercial and cut to the heart of Warrior's antitrust claim, finding the challenged rule does not harm competition and, consequently, does not unreasonably restrain trade or commerce.  Warrior's Sherman Act claim thus fails as a matter of law.

Two frameworks exist for analyzing Sherman Act claims:  the per se rule and the rule of reason.  *Care Heating & Cooling*, 427 F.3d at 1012.  But Warrior's failure to challenge the rule as per se unlawful in proceedings below leaves it with only a rule-of-reason argument.[3]  To state a claim under the rule-of-reason test, a plaintiff must allege, *inter alia*, that the purportedly unlawful contract, combination, or conspiracy "produced adverse, anticompetitive effects within relevant product and geographic markets." *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988) (internal quotation marks and citation omitted); *see also Nat'l Hockey League Players Ass'n*, 419 F.3d at 473 ("[A] plaintiff alleging an unreasonable restraint on trade under

---

[3]Although Warrior argues in its opening brief that the 2008 Rule Change is per se unlawful,  the NCAA responds that Warrior never raised this argument in the district court.  In its opinion, the district court explicitly noted that Warrior "does not contend that the *per se* rule applies."  This court "generally 'cannot consider an issue not passed on below,'" and exercises its "discretion to rule on an issue not decided below only in 'exceptional cases.'"  *St. Mary's Foundry, Inc. v. Emp'rs Ins. of Wausau*, 332 F.3d 989, 995–96 (6th Cir. 2003) (citations omitted).  Warrior fails to satisfy the "exceptional case" standard, so the panel bypasses analysis under the per se rule.

the rule of reason theory must show significant anti-competitive effects of the challenged restraint."). The Sherman Act exists for "the protection of *competition*, not *competitors*," *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990), and thus "the foundation of an antitrust claim is the alleged adverse effect on the market." *Care Heating & Cooling*, 427 F.3d at 1014.

Warrior's complaint fails to identify any anticompetitive effects on the market for lacrosse sticks attributable to the 2008 Rule Change (or, for that matter, to any other version of Rule 1-17). Rule 1-17, irrespective of the various versions' specifications, applies to all manufacturers, including Warrior, in exactly the same way.[4] Any manufacturer wishing to market a lacrosse stick approved for use in NCAA competition (or in any competition governed by the NCAA standards) must conform the stick to the dimensions specified in the rule. To be sure, rule changes impose costs on manufacturers: they must adapt their processes to make sticks that meet the new rule's specs; and their stock of non-conforming sticks becomes obsolete. But Warrior fails to allege any facts that would support a conclusion that the rule even arguably injures competition. Indeed, by complaining that the new rule will "neutralize Warrior's intellectual property rights and market position . . . opening the door and paving the way for new entrants," Warrior concedes that the 2008 Rule Change will increase competition, not reduce it. Because the new rule applies equally to all manufacturers, Warrior may compete in the market on the same footing as all other participants. This includes an ability to sell stick heads produced in conformity with its patent, which the 2008 Rule Change does not bar. Warrior's failure to allege an injury to competition dooms its Sherman Act claim as a matter of law.

---

[4] We note Warrior's complaint may inadequately allege the relevant market. *See, e.g.*, *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 963–64 (6th Cir. 2004).

B.

Under Michigan law, a claim of tortious interference with business relationship requires proof of (1) a valid business relationship or expectancy; (2) knowledge of that relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of that relationship or expectancy; and (4) resulting damage to the plaintiff. *Via The Web Designs, L.L.C. v. Beauticontrol Cosmetics, Inc.*, 148 F. App'x 483, 487 (6th Cir. 2005) (citing *Baidee v. Brighton Area Schs.*, 695 N.W.2d 521, 538 (Mich. Ct. App. 2005)). "The third element of [this] tort requires the plaintiff to demonstrate that the third party was induced either to breach the contract or to break off the prospective business relationship by an intentional act that is either (1) wrongful per se; or (2) lawful, but done with malice and unjustified in law." *Id.* (citing *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 812 (Mich. Ct. App. 2002)).

The district court rejected Warrior's tortious interference claim, finding that, though Warrior alleged collusion regarding the 2008 Rule Change in a way that might suggest malice, it ultimately failed to demonstrate "that the adoption of the 2008 Rule Change was done with a malicious and unlawful purpose, because the only effect of the 2008 Rule Change [when compared to the 2007 Rule Change] was to increase the number of sticks that would be allowed under the NCAA's rules." *Warrior II*, 2009 WL 646633, at *4. We decline to adopt the court's analysis, but agree with its ultimate conclusion.

"To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the[] defendant that corroborate the improper motive of the interference." *Erickson's Flooring & Supply Co. v. Tembec, Inc.*, 212 F. App'x 558, 566 (6th Cir. 2007) (quoting *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 597–98 (Mich. Ct. App. 2003)). Taking a comprehensive view of the allegations in the complaint, Warrior fails to allege specific, affirmative actions by the NCAA that corroborate its claim of malice. Indeed, its vague assertion that "in deciding to change the rules, [the NCAA] appears to have acted for improper and anticompetitive

reasons under the influence of one or more of the competitors of [Warrior]," Compl. ¶ 3, lacks the specificity required by Michigan law. And nothing about the content or character of the 2008 Rule Change—which applies equally to all lacrosse stick manufacturers—inherently suggests that the NCAA intended to cause Warrior harm.[5] Accordingly, we affirm the judgment in favor of the NCAA on Warrior's tortious interference claim.

### III.

For these reasons, we affirm the judgment of the district court.

---

[5]Nor does Warrior's repeated insistence that the Rule Changes do not actually make it easier to dislodge the ball create such an inference. Warrior fails to cite any law suggesting that a sports rule-making body with a facially plausible concern about a competition issue must supply empirical proof that a proposed rule change actually remedies the concern before enacting the rule.