**NOT RECOMMENDED FOR PUBLICATION**
File Name: 14a0598n.06

Nos. 13-1035/1087

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

VOLUNTEER ENERGY SERVS., INC.,　　　　　）

　　　　Plaintiff-Appellee/Cross-Appellant,　　　）

v.　　　　　　　　　　　　　　　　　　　　）　ON APPEAL FROM THE UNITED
　　　　　　　　　　　　　　　　　　　　）　STATES DISTRICT COURT FOR THE
　　　　　　　　　　　　　　　　　　　　）　WESTERN DISTRICT OF MICHIGAN

OPTION ENERGY, LLC, a Michigan Limited　　　）
Liability Company, jointly and severally,　　　　）

　　　　Defendant-Appellant/Cross-Appellee,　　）

and　　　　　　　　　　　　　　　　　　　）

JONATHAN ROCKWOOD, et al.,　　　　　　　）

　　　　Defendants.　　　　　　　　　　　　）

**FILED**
Aug 05, 2014
DEBORAH S. HUNT, Clerk

Before: MERRITT, BOGGS, and STRANCH, Circuit Judges.

BOGGS, Circuit Judge. This case involves a contract dispute between Volunteer Energy Services, Inc. ("Volunteer"), a natural-gas supplier that is incorporated and has its principal offices in Ohio, and Option Energy, LLC ("Option"), an alternative-energy broker that is organized in Michigan. The two companies entered into an Agent Agreement ("Agreement") on February 2, 2009, in which Option agreed to procure customers for Volunteer in exchange for commissions. During the life of the contract, Volunteer learned that Option was soliciting Volunteer customers and transferring them over to another supplier. Volunteer, in turn, withheld commissions due Option. Option eventually terminated the Agreement, effective April 21, 2011.

On May 27, 2011, Volunteer sued Option in federal district court in Michigan, claiming that Option breached its contract with Volunteer by transferring Volunteer's customers over to a competitor, and that Option and two of its executives, including its owner, president, and CEO Jonathan Rockwood, tortiously interfered with Volunteer's business relationships, in violation of Michigan law.  Option countersued, claiming, as relevant to this appeal, that Volunteer breached the contract by failing to pay Option the commissions that it had earned, and that, in so doing, Volunteer violated the Michigan Sales Representative Commission Act ("SRCA"), Mich. Comp. Laws § 600.2961.

The parties filed cross-motions for summary judgment, and the district court ruled that a key disputed provision in the Agreement—the non-solicitation/non-compete clause ("non-solicitation clause")—was ambiguous.  In particular, it was unclear whether the clause prohibited Option from soliciting Volunteer's customers a) both during the term of the Agreement and for a period of time following its termination or, alternatively, b) only following the termination of the Agreement.  The court held a bench trial to resolve the ambiguity, which it resolved in favor of Volunteer, finding that, given the parties' conduct and the communications between them during the course of their business relationship, the parties intended that the non-solicitation provision also apply during the term of the Agreement.  Option thus breached the contract by transferring some of Volunteer's customers over to a competitor while the Agreement was still in effect.  The district court awarded $509,000 in damages to Volunteer for lost profits.  The court rejected Volunteer's tortious-interference claims, however, as unsupported by the evidence: Volunteer "ha[d] shown nothing more than a breach of contract by the corporation, not a separate tort of tortious interference." *Volunteer Energy Servs., Inc. v. Option Energy, LLC*, No. 1:11-CV-554,

2

2012 WL 6084158 at *10 (W.D. Mich. Dec. 6, 2012), *judgment amended*, 2013 WL 1500433 (W.D. Mich. Apr. 10, 2013).

In addition, the district court found that Volunteer, too, had breached the contract by failing to pay the commissions that it owed Option. In addition, the court found that Ohio's sales-commission statute, Ohio Rev. Code § 1335.11, rather than Michigan's SRCA, properly applied to Option's claim for unpaid commissions, and, in accordance with the Ohio statute, the court awarded Option $159,000—treble damages for the commissions not paid. Because the contract required Volunteer to continue to make certain payments following the termination of the Agreement, the court also ordered, in an amended judgment, that Volunteer continue to make those commission payments as they come due.

Both sides appealed. Option asserts two claims. First, Option claims that it was entitled to summary judgment on the breach-of-contract claim because the non-solicitation clause was unambiguous: it applied only after the termination of the Agreement and only to Volunteer customers that had not previously been recruited by Option. Second, Option claims that the district court erred in awarding Volunteer anything other than nominal damages because Volunteer failed to prove lost profits with reasonable certainty. In its cross-appeal, Volunteer argues that it adequately proved its tortious-interference claims below, that Option was not entitled to treble damages for the unpaid commissions, and that Option had forfeited or waived any claim to ongoing commission payments.

We affirm the district court in all respects.

# I

## A

### 1

Option's first claim is that the contract's non-solicitation clause was unambiguous and prevented Option from soliciting Volunteer's customers only once the Agreement was terminated.

Under Ohio law, "[t]he role of courts in examining contracts is to ascertain the intent of the parties." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (internal quotation marks omitted). "[C]ourts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement." *Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio 1992). The interpretation of that language, including the determination of whether it is ambiguous, is a matter of law for initial determination by the court. *Savedoff*, 524 F.3d at 763. "Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Ibid.* (citations and internal quotation marks omitted). "[W]here the written contract is standardized and between parties of unequal bargaining power, an ambiguity in the writing will be interpreted strictly against the drafter and in favor of the nondrafting party." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1262 (Ohio 2003). Otherwise, "[i]t is generally the role of the finder of fact to resolve ambiguity." *Ibid.*

Since the question whether the contract was ambiguous is a question of law, we review the district court's ruling on the issue de novo.

The non-solicitation clause in the Agreement reads, in relevant part, as follows:

**For the term of this Agreement and for** the longer of (a) **one year after the Termination Date** (defined below) or (b) to Agent following termination, as set

4

> forth in Section 10, **Agent agrees that it will not** (1) employ any VESI [Volunteer Energy Services, Inc.] employee without VESI's prior written consent or solicit or attempt to induce any VESI employee to become its employee or the employee of any VESI competitor or customer; and/or (2) **solicit existing customers at the time of the termination date of VESI** (including those of VESI's affiliates) in the Territory regarding the purchase of natural gas by any such customer.

(emphasis added). The highlighted portion of the Agreement, read grammatically, states: "For the term of this Agreement and for one year after the Termination Date, Agent agrees that it will not solicit existing customers at the time of the termination date of VESI." Volunteer argues that the phrase "for the term of this Agreement" means that Option was not allowed to solicit Volunteer customers both during the term of the Agreement and for a period following its termination. Option argues that the phrase "existing customers at the time of the termination date" means that the non-solicitation provision only took effect once the contract was terminated. Option also argues that, since Volunteer drafted the Agreement, any ambiguity should be construed against Volunteer. The district court determined that the apparently conflicting language—"for the term of this Agreement" and for a time thereafter, on the one hand, and "at the time of the termination date," on the other, rendered the contract ambiguous. It therefore held a bench trial and determined the contract's meaning based on extrinsic evidence, finding that the parties intended that the non-solicitation provision apply during the term of the Agreement and for a time thereafter, not just following termination.

We agree with the district court that the contract's non-solicitation clause was ambiguous: at the outset, it states that the provision applies "for the term of this Agreement" and for a period thereafter, and in the body, it states that the provision applies "at the time of the termination date." Option argues that the words "for the term of this Agreement" apply only to the first sub-clause (prohibiting Option from soliciting Volunteer employees), and that the

5

language "at the time of the termination date" applies only to the second sub-clause (prohibiting Option from soliciting Volunteer customers). But such an interpretation would contravene the structure of the provision, which plainly applies the limitation "for the term of this Agreement" to both sub-clauses, not just the first. Both Volunteer's and Option's interpretations emphasize certain language to the exclusion of other language. We conclude that the inartfully drafted provision is susceptible of two reasonable interpretations—or, perhaps more accurately given its self-contradictory language, that it is susceptible of *no* reasonable interpretation—and that the contract is therefore ambiguous as to when Option was prohibited from soliciting Volunteer customers.

Option argues that any ambiguity should nonetheless be construed in its favor since Volunteer drafted the contract. But Option does not acknowledge that the *contra proferentem* doctrine to which it alludes applies only "where the written contract is standardized and between parties of unequal bargaining power." *See Westfield Ins. Co.*, 797 N.E.2d at 1262. The prototypical cases to which this doctrine applies are those involving insurance contracts with individual consumers. *See*, *e.g.*, *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34 (Ohio 2007) ("Ambiguity in an insurance contract is construed against the insurer and in favor of the insured."). Option does not claim that its contract with Volunteer involved the kind of "unequal bargaining power" that is often inherent in a contract of adhesion, and the facts do not appear to support such a conclusion. Accordingly, we reject Option's invitation to construe the ambiguity against Volunteer.

Option does not contest the district court's factual findings made in an effort to resolve the ambiguity that it perceived. We thus affirm the district court's determination that the non-

solicitation provision should be read to apply both during the term of the Agreement as well as for a period thereafter.

**2**

Option also claims that the provision preventing the solicitation of "existing customers" refers only to customers that are not "Agent Customers," and that, therefore, the solicitation of Agent Customers would not have constituted a breach of the Agreement. The contract defines "Agent Customers" to include customers brought to Volunteer by Option and to exclude those with whom Volunteer already had a relationship prior to the date of the Agreement. The contract does not define the terms "customers" or "existing customers."

We reject Option's argument that the term "customers" excludes "Agent Customers." In general, "common, undefined words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or some other meaning is clearly evidenced from the face or overall contents of the instrument." *State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 820 N.E.2d 910, 915 (Ohio 2004) (citations and internal quotation marks omitted). Where the Agreement prohibits the solicitation of "customers," it refers to *any* customers, and cannot be read as an attempt to designate a particular subset of customers. Such a construction would read into the Agreement an ambiguity that does not exist. *See Swartzentruber v. Wee-K Corp.*, 690 N.E.2d 941, 945 (Ohio Ct. App. 1997) ("[C]ourts should refrain from reading ambiguity into an agreement where it does not otherwise exist."). Nor would such a construction make sense: of all the customers Volunteer would have been concerned about losing to a competitor, it would have been most concerned about losing Agent Customers—i.e. those customers with whom Option already had a preexisting relationship. For that reason, it would make little sense for the non-solicitation provision to have excluded Agent Customers. As the district court concluded:

7

"There is no ambiguity in the meaning of the term 'customers' as it is used in the Agent Agreement. Agent Customers are the Volunteer customers that were solicited by Option. Agent Customers are a subset of Volunteer's customers." *Volunteer Energy Servs., Inc. v. Option Energy, LLC*, No. 1:11-CV-554, 2012 WL 3545283 at *5 (W.D. Mich. Aug. 16, 2012).

**B**

Option's second claim on appeal is that Volunteer failed to establish its damages from lost profits with reasonable certainty.

Under Ohio law, whether evidence is too speculative to prove profits with reasonable certainty is a determination to be made by the trial court. *Illinois Controls, Inc. v. Langham*, 639 N.E.2d 771, 783 (Ohio 1994). In Ohio courts, "[s]uch a determination will not be reversed on appeal absent an abuse of discretion." *Ibid.* Since whether lost profits were proved with reasonable certainty requires weighing the evidence presented to the trial court, we treat the issue as a factual determination by the trial court and review it as such. Under the federal standard of appellate review, which is analogous to that of the state courts in this instance, "[w]e will not set aside the district court's findings of fact unless we find them to be clearly erroneous." *O'Sullivan Corp. v. Duro-Last, Inc.*, 7 F. App'x 509, 513 (6th Cir. 2001). The clear-error standard is met "if, based on the entire record, we are left with the definite and firm conviction that a mistake has been committed." *Stryker Corp. v. XL Ins. Am.*, 735 F.3d 349, 354 (6th Cir. 2012) (citations and quotation marks omitted).

Under Ohio law, "in order for a plaintiff to recover lost profits in a breach of contract action the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." *City of Gahanna v. Eastgate Props., Inc.*, 521 N.E.2d 814, 818 (Ohio 1988). "There must be more than a conclusory statement as to the amount of lost profits. An

8

explanation of how that sum was determined is required. Lost profits must be substantiated by calculations based on facts available or in evidence, otherwise they are speculative and uncertain." *Rhodes v. Rhodes Indus., Inc.*, 595 N.E.2d 441, 448 (Ohio Ct. App. 1991) (internal citations omitted).

Option argues on appeal, as it did below, that Volunteer's evidence was insufficient because it was based on the conclusory and unsupported statements of Volunteer Vice President Shawn Hall as to a) the annual load of natural gas purchased by the customers switched by Option and b) the $1.20-per-mcf (1,000 cubic feet) profit margin that Volunteer would have earned on those forgone sales. Option cites *Kinetico, Inc. v. Indep. Ohio Nail Co.*, 482 N.E.2d 1345, 1350 (Ohio Ct. App. 1984), in support of its argument, a case in which the appellate court reversed the trial court's damages award for lost profits. The appellate court found that the witness at trial did not testify from personal knowledge as to the "sales quotas" on which he relied, nor could he explain how the quotas were arrived at or why they were reliable sales estimates. *Id.* at 1349. The court also noted that the witness testified that the "net margin" estimate used to calculate lost profits was "not profit," and instead, that profit would have been "a very small portion" of that estimate. *Ibid.*

As the district court explained, this case is materially distinguishable from *Kinetico*. Volunteer's witness testified from personal knowledge and explained that the annual-load estimate on which he relied reflected the annual *historical* natural-gas usage of each of the transferred customers. Volunteer's summary-judgment motion included an exhibit that listed each of those transferred customers individually along with that customer's annual natural-gas usage. Thus, unlike the unexplained estimates in *Kinetico*, the estimates here were rooted in concrete and uncontested historical fact. Also, unlike the margin calculation in *Kinetico*,

9

Volunteer's witness here explained the calculation behind the profit-margin figure and why that figure was appropriate. Moreover, as the district court noted, Option "essentially opted not to cross-examine Mr. Hall on the issue of damages." *Volunteer Energy*, 2013 WL 1500433 at \*3. Option continues to point to no evidence on appeal that would indicate that the district court should not have relied on Hall's estimates. Thus, we cannot say that the district court clearly erred in finding that profits were proved with reasonable certainty.

## II

## A

We turn to Volunteer's claims, first addressing its tortious-interference claims. Volunteer originally asserted tortious-interference claims against a) Option, b) Jonathan Rockwood, the sole owner, president, and CEO of Option, and c) Ivan Pillars, another Option executive. The parties stipulated to the dismissal of the claim against Pillars, and the district court entered judgment in favor of Rockwood on Volunteer's tortious-interference claim against him. It is unclear from the record how the tortious-interference claim against Option itself was resolved, but we can reasonably conclude that that claim, too, was denied: First, the facts giving rise to a claim against Rockwood are the same as those underlying any claim against Option. Second, no judgment was entered in favor of Volunteer on the claim. And third, Volunteer does not appear to assert an independent claim against Option on appeal. Since Volunteer's tortious-interference claim against Option was not preserved or addressed on appeal, we decline to consider any such claim. That leaves the claim against Rockwood.

Option argues that, because Volunteer failed to name Rockwood in the notice of cross-appeal that it filed, its claim against him was not adequately preserved. We need not decide

10

whether Volunteer adequately preserved its claim against Rockwood because, in any event, we affirm the district court's denial of that claim on the merits.

As a threshold matter, we address the appropriate standard of review. Volunteer contends that the district court's ruling on the claim is a question of law, which we review de novo. Second Br. of Appellee at 38. Option counters that Volunteer's claim challenges the district court's factual findings and should therefore be reviewed for clear error. Third Br. of Appellant at 12. The essence of Volunteer's argument is that, in transferring customers away from Volunteer, Rockwood sought "retaliation" and "self-serving profits" and acted with "a malicious intent to harm." Second Br. of Appellee at 39, 41. Because this argument reflects a different view of the facts rather than a different view of the law, we review the district court's determination for clear error. *See Tackett v. M & G Polymers USA, LLC*, 733 F.3d 589, 595–96 (6th Cir. 2013) ("After a bench trial, we review the district court's factual findings for clear error."). Again, the clear-error standard is met "if, based on the entire record, we are left with the definite and firm conviction that a mistake has been committed." *Stryker Corp.*, 735 F.3d at 354 (citations and quotation marks omitted).

"Under Michigan law, a claim of tortious interference with [a] business relationship requires proof of (1) a valid business relationship or expectancy; (2) knowledge of that relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of that relationship or expectancy; and (4) resulting damage to the plaintiff." *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 286 (6th Cir. 2010). "The third element of this tort requires the plaintiff to demonstrate that the third party was induced either to breach the contract or to break off the prospective business relationship by an intentional act that is either (1) wrongful per se; or (2)

11

lawful, but done with malice and unjustified in law." *Id.* at 287 (citations, quotation marks, and internal alteration marks omitted). "A 'per se wrongful act' is an act that is inherently wrongful or one that is never justified under any circumstances." *Formall, Inc. v. Cmty. Nat'l Bank of Pontiac*, 421 N.W.2d 289, 293 (Mich. Ct. App. 1988). "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Erickson's Flooring & Supply Co. v. Tembec, Inc.*, 212 F. App'x 558, 566 (6th Cir. 2007) (citations and quotation marks omitted). A plaintiff "must demonstrate, with specificity, affirmative acts by the interferer which corroborate the unlawful purpose of the interference." *Formall*, 421 N.W.2d at 292–93. "[T]he interference with a business relationship must be improper in addition to being intentional. Improper means illegal, unethical, or fraudulent." *Ibid.*

The district court accurately recited the legal standard for tortious interference and concluded that "the evidence does not support a finding of tortious interference," as Volunteer "has shown nothing more than a breach of contract by the corporation, not a separate tort of tortious interference." *Volunteer Energy*, 2012 WL 6084158 at *10. The district court did not explain further why its findings of fact did not rise to the level of tortious interference. In its findings of fact, however, it identified no malice on Rockwood's part, nor did it indicate any "illegal, unethical, or fraudulent" behavior. On the contrary, the court recognized that Option encountered numerous difficulties in the course of its relationship with Volunteer that precipitated its decision to switch customers over to a competitor:

> Option switched customers . . . because Rockwood was not satisfied with . . . aspects of Option's relationship with Volunteer, including Volunteer's failure to promptly and efficiently enroll customers Option brought in, Volunteer's failure to communicate pricing information, Volunteer's failure to offer a fixed rate program, Volunteer's failure to pay commissions on a timely basis, Volunteer's failure to offer a higher commission rate, and Volunteer's failure to offer a

12

contract more similar to Option's contract with Integrys, which specified that Option could place the interest of its customers before those of the supplier.

*Id.* at *7.

Volunteer does not identify any erroneous findings of fact by the district court. Rather, it asks us to read malice into Option's breach of its contract with Volunteer and its decision to solicit Volunteer's customers on behalf of a Volunteer competitor. The record, however, does not support any such inference: Rockwood acted for business reasons, not out of malice.

In addition, Volunteer acknowledges that its customers' contracts were terminable at will. Under Michigan law, one who, for competitive reasons, causes a third party not to continue with a contract that is terminable at will, ordinarily "does not interfere improperly with the other's relation." *Feldman v. Green*, 360 N.W.2d 881, 890 n.2 (Mich. Ct. App. 1984). Given that Volunteer does not claim that Rockwood induced a breach—as opposed to termination—of agreements between Volunteer and its customers, Rockwood's conduct does not appear to have been unlawful. Volunteer argues that, under *Tata Consultancy Servs. v. Sys. Int'l, Inc.*, 31 F.3d 416, 424–25 (6th Cir. 1994), even contracts terminable at will can give rise to a tortious-interference claim. *Tata* dealt with the related but distinct tort of tortious interference with contract, not with a business relationship. But even if that distinction is immaterial, *Tata* suggested only that a claim may be sustained where a contract is terminable at will if other behavior by the defendant constitutes wrongful interference. *Ibid.* Here, Volunteer appears to argue that Rockwood's purported malice and greed supply this missing element, but as previously explained, the record does not support such a finding.[1]

---

[1] Again, to prove tortious interference, Volunteer must point to an intentional act that is either (1) wrongful per se; or (2) lawful, but done with malice and unjustified in law. Volunteer cannot show that Rockwood acted maliciously. It is unclear whether Rockwood's breach of its contract with Volunteer qualifies as an act that is "wrongful per se" under Michigan law. It seems unlikely that a breach of contract would be considered an act "never justified under

13

The district court's findings of fact were not clearly erroneous, and the court did not err in concluding that those facts failed to prove the elements of a tortious-interference claim.

**B**

Volunteer next argues that the district court erred in awarding exemplary damages to Option for the unpaid commissions. Option counters that this claim was not raised below and should therefore not be considered, and that, even had it been preserved, it has no merit, because the intentional withholding of commissions is sufficient to warrant treble damages under Ohio's sales-commission statute.

We reject Option's argument that Volunteer's claim is not properly before us. Volunteer expressly argued below that it was not liable for exemplary damages under the Ohio statute, and the district court expressly ruled on the issue, holding that "Volunteer's decision to withhold commissions was willful" and "was not excused by Option's violation of the non-solicitation provision, or by a common-law right of set-off." *Volunteer Energy*, 2012 WL 6084158 at *10. Option's argument that Volunteer failed to raise its claim below is without merit.

The parties agree that we review de novo the district court's conclusion of law as to the applicability of exemplary damages. Under the Ohio statute, a principal who fails to timely pay a sales representative all commissions due is "liable in a civil action for exemplary damages in an amount not to exceed three times the amount of the commissions owed to the sales representative if the sales representative proves that the principal's failure . . . constituted willful, wanton, or reckless misconduct or bad faith." Ohio Rev. Code Ann. § 1335.11(D). The sales representative is also entitled to reasonable attorney's fees and costs. *Ibid.* Volunteer does not dispute that Option earned the commissions or that Volunteer's decision to withhold payment

---

any circumstances." *See Formall, Inc.*, 421 N.W.2d at 293. Regardless, given that Volunteer does not make or develop any argument that Option's breach was wrongful per se, we decline to consider that possibility.

14

was deliberate. It claims, however, that because Option breached the Agreement, resulting in a damages award to Volunteer of $509,000, Volunteer's behavior in withholding the commissions cannot be construed as "willful misconduct." Instead, Volunteer argues that it was merely exercising its common-law right of setoff to recover some of the damages that it was owed.

The cases Volunteer cites in support of its view are inapposite. Volunteer first cites *Miller v. Pennitech Indus. Tools, Inc.*, No. 2356-M, 1995 WL 230894, at *6 (Ohio Ct. App. Apr. 19, 1995), in which the appellate court held that the principal was entitled to present evidence in support of its claim for damages, reversing the trial court's grant of summary judgment to the sales representative. Here, whether Volunteer was entitled to prove its damages is not in dispute. *Miller*, which dealt with a predecessor statute, did not address the question whether intentionally withholding commissions was ever permissible. Volunteer also cites *R.E. Condit Co. v. Colston, Cal.*, No. CA10375, 1987 WL 20254 (Ohio Ct. App. Nov. 18, 1987), in which the principal was entitled to an offset, but that case predated any statutory enactment on point and is therefore irrelevant.

The district court concluded that, although it was aware of no Ohio case addressing the issue, "a right of set-off would not be consistent with the statutory requirement that the principal pay 'all commissions due' within a strict time frame, or face liability for exemplary damages." *Volunteer Energy*, 2012 WL 6084158 at *10. The court also looked to the Michigan courts' interpretation of the parallel Michigan SRCA for guidance, noting that in *Peters v. Gunnell, Inc.*, 655 N.W.2d 582, 587 (Mich. Ct. App. 2002), the Michigan Court of Appeals held: "Nothing in the SRCA suggests that it is necessary or proper for a principal to reduce commissions that are due by the amount of expenses that might later be deemed owed by a sales representative." *Ibid.* The district court concluded that Option was therefore entitled to treble damages.

15

Although it seems clear that Option would have been entitled to damages under the Michigan statute, whether it was entitled to damages under the Ohio statute is less clear. The language employed by the two statutes differs in one critical respect: whereas the Michigan statute imposes liability where the failure to pay is "intentional," the Ohio statute does so only where the failure to pay "constituted willful, wanton, or reckless misconduct or bad faith." *See* Mich. Comp. Laws § 600.2961(5)(b); Ohio Rev. Code Ann. § 1335.11(D). This distinction suggests that the standard for liability under the two statutes is different. In fact, the Michigan appellate court specifically distinguished the requirement of intent under the SRCA from a requirement of, for example, bad faith: "The SRCA does not mention bad faith or any other mental state of a principal." *Peters*, 655 N.W.2d at 588.

The question, then, is whether, as the district court found, Volunteer's deliberate withholding of commissions owed constituted "willful misconduct" under the Ohio statute. The Ohio Supreme Court has defined "willful misconduct" to require intent both with respect to the conduct and with respect to its wrongful quality: "The word, 'wilful,' used in the phrase, 'wilful misconduct,' implies intent, but the intention relates to the misconduct and not merely to the fact that some specific act, such as operating an automobile, was intentionally done. The intention relates to the commission of wrongful conduct, independent of the intent to use certain means with which to carry out such conduct." *Tighe v. Diamond*, 80 N.E.2d 122, 127 (Ohio 1948) (internal citations omitted). "Thus, 'willful' misconduct is 'an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury.'" *Hunter v. Columbus*, 746 N.E.2d 246, 252 (Ohio Ct. App. 2000) (quoting *Tighe*, 80 N.E.2d at 127).

16

The Ohio sales-commission statute imposes a clear obligation on the principal to pay the sales representative in a timely manner upon termination of the contract:

> Upon the termination of a contract between a principal and a sales representative for the solicitation of orders for a product or orders for services, the principal shall pay the sales representative all commissions due the sales representative at the time of the termination within thirty days of the termination and shall pay the sales representative all commissions that become due after the termination within thirteen days of the date on which the commissions become due.

Ohio Rev. Code Ann. § 1335.11(C). The statute does not provide for a common-law right of setoff or any other exceptions to the principal's obligation. Accordingly, we conclude that the principal, Volunteer, had a "clear duty" to pay the commissions, and that it "intentionally deviated" from that duty by refusing to pay them.

To be sure, not all intentional refusals to pay constitute "willful misconduct." For example, had Volunteer not paid Option because it believed—mistakenly—that no commission had been earned, its failure to pay, though intentional, would likely not have constituted willful misconduct. That is because, although Volunteer would have intended not to pay, it would not have intended conduct that would violate the statute i.e. it would not have intended to withhold a commission that had been earned and was owed. Here, Volunteer intended to withhold such a commission and did so.

We agree that Volunteer's deliberate withholding of commissions constituted willful misconduct and affirm the district court's exemplary-damages award.

## C

Finally, Volunteer argues that, by failing to raise a claim to ongoing commission payments at trial, Option waived its right to such payments. Option moved the district court to amend its judgment to require such payments, and the court granted Option's motion. Volunteer asks that we reverse the district court's decision.

17

"[W]e generally review a grant or denial of a motion to alter or amend a judgment under Rule 59(e) for abuse of discretion." *ACLU of Ky. v. McCreary Cnty., Ky.*, 607 F.3d 439, 450 (6th Cir. 2010). We review de novo questions of law raised by such a motion. *See*, *e.g., Johnson v. City of Memphis*, 617 F.3d 864, 867 (6th Cir. 2010) (reviewing de novo a district court's grant of summary judgment following a Rule 59(e) motion).

"A district court may grant a timely Rule 59 motion to alter or amend judgment to correct a clear error of law; to account for newly discovered evidence or an intervening change in the controlling law; or to otherwise prevent manifest injustice." *Doran v. Comm'r of Soc. Sec.*, 467 F. App'x 446, 448 (6th Cir. 2012). Here, the district court held that, in view of the unambiguous requirement under the Agreement that Volunteer pay commissions for forty-eight months following termination, "it would be a manifest injustice not to amend the judgment to require the payment of additional commissions . . . as they come due." *Volunteer Energy*, 2013 WL 1500433 at *5. The court determined that, although Option failed to specifically request declaratory relief in the form of continued payments, neither did it waive or relinquish its right to such payments. *Ibid.* The court also noted that Option may reasonably have assumed that the issue was not in dispute: Under the terms of the Agreement, Option was entitled to forty-eight months of commission payments following termination unless Volunteer terminated the Agreement for cause. The court found, and the parties do not dispute, that Volunteer did not terminate the Agreement for cause; rather, Option terminated the Agreement. As a result, the court correctly concluded that Volunteer was required to continue to pay Option commissions for forty-eight months following termination.

Volunteer argues that the district court erred in granting Option relief because Option waived its claim to ongoing commissions by not raising the claim in earlier proceedings. Even if

18

Option's omission did constitute waiver, however, that does not mean that the district court erred in granting Option's Rule 59(e) motion. "Deviation from the rule of waiver is permissible when application of the rule would result in a manifest injustice." *Fryman v. Fed. Crop Ins. Corp.*, 936 F.2d 244, 251 (6th Cir. 1991). "In the appellate context, whether or not the circumstances of a particular case justify deviation from the normal rule of waiver is left largely to the discretion of the appellate court." *Ibid.* The discretion of a trial court to grant a Rule 59(e) motion in order to prevent manifest injustice is analogous. *Ibid.* Here, the trial court determined that manifest injustice would result in the absence of an amended judgment.

Volunteer makes no argument as to why the court's manifest-injustice determination was erroneous. That is, it does not explain why a judgment denying relief that is clearly owed under the parties' agreement would not constitute a "manifest injustice" worthy of the district court's corrective action. Our cases do not offer clear guidance as to what qualifies as "manifest injustice," but the plain meaning of those words is instructive. Black's Law Dictionary defines the phrase "manifest injustice" to mean: "An error in the trial court that is direct, obvious, and observable, such as a defendant's guilty plea that is involuntary or that is based on a plea agreement that the prosecution rescinds." BLACK'S LAW DICTIONARY 982 (8th ed. 2004). Of course, as the examples suggest, more than a clear error is required; injustice must also result.

Here, the error was obvious—the Agreement plainly provided for ongoing commission payments and the judgment did not account for them. In addition, the error would have resulted in an injustice—i.e. a "wrong," "want of equity," or "unfairness"—in not giving Option its due "desert." *See* 7 Oxford English Dictionary 982, 8 Oxford English Dictionary 325–26 (2d ed. 1989) (defining "injustice" as "[t]he opposite of justice; unjust action; wrong; want of equity,

unfairness," and defining justice, in turn, as "[e]xercise of authority or power in maintenance of right; vindication of right by assignment of reward or punishment; requital of desert.")

In view of the foregoing, we hold that the district court did not abuse its discretion in amending its judgment and the substance of the amendment contained no legal error. Volunteer's request to reverse the amendment is denied.

## V

In summary, as to Option's claims on appeal, we affirm the district court's determination that the contract was ambiguous and affirm its award of damages to Volunteer for lost profits, as the district court did not clearly err in finding that lost profits were established with reasonable certainty.

As to Volunteer's claims, we affirm the district court's judgment in favor of Rockwood on Volunteer's tortious-interference claims, affirm the exemplary-damages award on the ground that Volunteer's failure to pay commissions constituted "willful misconduct," and affirm the court's decision to require Volunteer to make ongoing commission payments to Option as they come due.